Below is an Opinion of the Court.

*David W. Hercher*
_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>**Cheryl Kae Stites**,<br><br><div align="right">Debtor.</div> | Case No. 14-35071-dwh7 |
| In re<br><br>**Kathleen Arthur**,<br><br><div align="right">Debtor.</div> | Case No. 15-62393-tmr7 |
| In re<br><br>**Mary Ann Michiko Roberts**,<br><br><div align="right">Debtor.</div> | Case No. 15-63116-tmr7 |
| **United States Trustee**,<br><br><div align="center">Plaintiff,</div><br><div align="center">v.</div><br><br>**Vincent Howard, Howard Law, P.C., Erik Graeff,** and **Law Offices of Erik Graeff, P.C.**,<br><br><div align="center">Defendants.</div> | Adversary Proceeding Nos. 16-03013-dwh,<br>16-6061-dwh, and 16-6062-dwh<br><br>MEMORANDUM DECISION<br>(NOT FOR PUBLICATION) |

## I.    Introduction

This memorandum decision explains my separate judgment of today in these actions, and it constitutes my findings of fact and conclusions of law.

I will enter judgment in the action in the Mary Ann Michiko Roberts case requiring that defendant Howard Law, P.C., pay $1,983 to her bankruptcy estate, and I will enjoin Howard Law from future violations of 11 U.S.C. § 526(a)(2). (Unless the context specifies otherwise, all section references are to title 11.) I will otherwise enter judgment in favor of defendant Vincent Howard and Howard Law in these three actions. A previous stipulated judgment resolved the claims by plaintiff United States trustee against defendants Erik Graeff and Law Offices of Erik Graeff, P.C.[1]

Below, I generally refer to Howard and Howard Law jointly as Howard Law, but I refer to them separately with regard to remedies.

## II.    Overview

These three actions in three chapter 7 cases have been consolidated and were tried together on April 3 through 5, 2017. I refer to the actions by the last names of the three debtors in whose main cases the actions were filed: Cheryl Kay Stites, Kathleen Arthur, and Mary Ann Michiko Roberts.

These are actions to determine whether Howard Law misrepresented services, failed to perform promised services, advised a client to make false statements, failed to disclose compensation, or received excess compensation. Attached to the court's final pretrial order[2] is a statement of the parties' stipulated facts, marked as Exhibit 1, and their claims and defenses,

---

[1] Stipulated Judgment Regarding Claims Asserted by Plaintiff United States Trustee against Erik Graeff and the Law Offices of Erik Graeff, P.C., entered as docket item 96 in the Stites action. Other bracketed numbers are numbers of other items on the docket in the Stites action. Copies of each referenced document are also filed in the Arthur and Roberts actions.

[2] Final Joint Pretrial Order re United States Trustee's Complaints for Refund of Fees, Injunctive Relief, Civil Penalties, and Other Sanctions entered [88] (pretrial order).

marked as Exhibit 2. Plaintiff, the United States Trustee for Region 18 (UST), makes claims against Howard Law under five Bankruptcy Code provisions (listed in the order addressed in the pretrial order): section 526(a)(3), prohibiting a debt-relief agency from misrepresenting its services; section 526(a)(1), prohibiting an agency from failing to perform services it proposed to perform; section 526(a)(2), prohibiting an agency from advising or counseling a debtor to make a false or misleading statement in bankruptcy documents; section 329(a), requiring disclosure of compensation paid during the prepetition year; and section 329(b), permitting a court to require disgorgement of excessive compensation paid to a debtor's attorney during that year.

## III.  Facts

### A.  *Background*

Vincent Howard is a California-licensed attorney[3] and the president and sole shareholder of Howard Law, P.C.[4] He was formerly a principal of Howard Nassiri, P.C., and Howard Nassiri LLP. Howard Law is the successor to Howard Nassiri.[5] The parties appear to agree that the distinction between Howard Nassiri and Howard Law is unimportant.

Howard is a California-licensed lawyer who isn't and never has been licensed to practice law in Oregon.[6]

Morgan Drexen, Inc., is a company that provided administrative support for lawyers. It also operated at one time as MDRX.[7] Howard Law hired Morgan Drexen to provide paralegal, accounting, and administrative support to clients seeking bankruptcy and other debt-relief services.[8]

---

[3] Pretrial order, Ex. 1 at 1, ¶ 1.
[4] Pretrial order, Ex. 1 at 1, ¶ 2.
[5] Pretrial order, Ex. 1 at 2, ¶ 3.
[6] Pretrial order, Ex. 1 at 1, ¶ 1.
[7] Pretrial order, Ex. 1 at 5, ¶¶ 21, 22.
[8] UST trial exhibit (Ex.) 5.

Howard Law delegated much of its administrative and client-communication functions to the nonattorney staff of Morgan Drexen. Howard Law and Morgan Drexen developed a network of attorneys licensed throughout the United States with whom Howard Law shared legal work.

Rather than hire associates licensed in other states in the manner of a traditional national law firm, Howard instead engaged out-of-state attorneys to act as what Howard called "local counsel," with Howard Law acting as "engagement counsel." The out-of-state local counsel were "members" of Howard Law, acting in an "of counsel" capacity. Local counsel were not full-time associates of Howard Law, but they enjoyed an ongoing, close professional relationship with Howard and Howard Law.

Erik Graeff is an attorney licensed in Oregon, Washington, and California.[9] He is the president of The Law Offices of Erik Graeff, P.C.[10] In addition to his work at his own firm, he was an of-counsel member of Howard Law and acted as local counsel for Howard Law clients living in Oregon. Eventually, he became engagement counsel through an agreement with Morgan Drexen.

James Loy and Brandon Rennie are the only other Oregon-licensed attorneys who also had of-counsel relationships with Howard Law and served as local counsel to Oregon residents who were clients of Howard Law.[11] Rennie left the network sometime in late 2014 or early 2015.[12] Loy has never been a bankruptcy lawyer.[13]

As of the time of trial, Howard Law no longer handled bankruptcy cases.

---

[9] Pretrial order, Ex. 1 at 3, ¶ 12.

[10] Pretrial order, Ex. 1 at 3, ¶ 13.

[11] Pretrial order, Ex. 1 at 8-10, ¶¶ 40-58.

[12] Pretrial order, Ex. 1 at 9, ¶ 48 (dating Rennie's departure at "approximately four to six months before" his April 21, 2015, examination).

[13] Pretrial order, Ex. 1 at 9, ¶ 56.

### B.    *The structure of the Morgan Drexen attorney network*

As noted above, Howard Law developed of-counsel relationships with a network of attorneys licensed in jurisdictions throughout the country. These attorneys were listed as associates on its website, which was managed by Morgan Drexen.[14] The of-counsel attorneys were not "associates" as that term is ordinarily used. Instead, they typically maintained their own separate and independent law practices while devoting part of their time to working as local counsel for Howard Law clients. According to the engagement letters signed by each local counsel, Howard Law did not enter into an attorney-client relationship with local counsel's separate clients. In other words, of-counsel members of the network who maintained their own separate practices could have clients of their own, who were not clients of Howard Law.[15] Clients paid fees to Howard Law through Morgan Drexen; they did not pay local counsel directly. In exchange for acting as local counsel, an attorney would receive a fixed monthly retainer, incentives for certain kinds of services, and 85 percent of the fees clients paid for limited-scope litigation services when necessary.[16]

The network was centered around Morgan Drexen, which, at least in theory, had no customer or client relationship with the clients. Instead, Morgan Drexen's only client (initially) was Howard Law, and Morgan Drexen interacted with clients solely as Howard Law's agent. Howard Law paid Morgan Drexen for its services; Morgan Drexen did not bill clients on its own behalf—instead, it billed them on behalf of Howard Law. But for practical purposes, Morgan Drexen was the heart of the attorney network. Clients communicated primarily if not exclusively with Morgan Drexen. If necessary, Morgan Drexen would arrange for direct communication between a client and local counsel. All fees were paid through Morgan Drexen's accounting

---

[14] UST Ex. 40 at 5.
[15] UST Ex. 1 at 3; UST Ex. 12 at 4; UST Ex. 13 at 1.
[16] UST Ex. 1 at 4; UST Ex. 12 at 4; UST Ex. 13 at 2.

department. Clients were solicited through advertising created by Morgan Drexen, and the enrollment process was handled by Morgan Drexen. Nevertheless, Morgan Drexen's agreement with Howard Law acknowledged the legal requirement that Morgan Drexen refrain from giving clients legal advice and made Howard Law responsible for ethically mandated supervision of Morgan Drexen.[17]

Eventually, Morgan Drexen became dissatisfied with having only one law-firm client, Howard Law. To expand its business, Morgan Drexen began approaching some of Howard Law's local counsel to encourage them to become engagement counsel.[18] In other words, Morgan Drexen asked local counsel to hire Morgan Drexen to work directly for them in connection with their own local law practices.[19] Graeff was one of the local counsel who agreed to engage with Morgan Drexen directly, i.e., Graeff became engagement counsel in the Morgan Drexen network while he continued to act as local counsel to Howard Law.[20]

Instead of creating an independent "network" for each engagement counsel, Morgan Drexen instead created a system whereby each new engagement counsel could be plugged into the existing network of attorneys. The arrangements described above regarding the relationship between engagement counsel and local counsel applied to the new engagement counsel, just as they applied to Howard Law when it acted as engagement counsel. In other words, Morgan Drexen would still collect fees from clients and pay them to engagement counsel, who, in turn, would pay local counsel a portion of those fees and would pay Morgan Drexen for its administrative services. Logically, this approach should have dictated that each engagement counsel would have an independent agreement with each local counsel, but that isn't what

---

[17] UST Ex. 5 at 1.
[18] David Walker trial testimony (Trial test.), April 4, 2017, at 3:47 p.m.
[19] *Id.*
[20] UST Ex. 3.

happened. Instead, Howard Law agreed to permit the non-Howard Law engagement counsel to help themselves to the services of its local counsel, even though those local counsel had no direct relationship with the non-Howard engagement counsel.[21]

Howard Law's reasons for permitting other engagement counsel to tap into Howard Law's existing network of local counsel are unclear. Howard Law argues that Morgan Drexen harmed its business interests by recruiting new engagement counsel to compete against it.[22] Nevertheless, Howard Law allowed its new competitors to take advantage of the network of attorneys that it had assembled through Morgan Drexen. Its explanation for this seemingly self-defeating economic behavior is that it was acting out of concern for its competitor's clients. A more plausible explanation is that it simply acquiesced in Morgan Drexen's efforts to expand its network, and the legal niceties of the expansion were an afterthought.

Even though it had no attorney-client relationship with clients of other engagement counsel, Howard Law's name nevertheless inexplicably appears on the letterhead that Morgan Drexen used in communicating with other engagement counsel's clients. For example, on a letter from The Law Offices of Erik Graeff to Arthur—who was never its client—the following notations appear on the letterhead:[23] "Of Counsel Network of Regional Attorneys"; "Howard Law, P.C., Firm of Counsel, Principal Licensed in California." By comparison, a letter from Howard Law to Stites—who was a client of Howard Law—uses the same letterhead with the same notations. The only difference is the name of the engagement-counsel firm.[24] I see no reason for Morgan Drexen to have referred to Howard and Howard Law on a letter addressed to

---

[21] UST Ex. 3 at 3.
[22] Defendants Vincent Howard and Howard Law, P.C.'S Closing Argument [121] (Howard Posttrial Br.) at 31; *see also* Walker tr. test. April 4, 2017, at 3:48 p.m.
[23] UST Ex. 22.
[24] UST Ex. 18.

a client of a different firm. Similarly, Rennie was identified as "Of Counsel to The Law Offices of Erik Graeff PC" on a document sent to and signed by Arthur.[25] But Rennie wasn't of counsel to The Law Offices of Erik Graeff; he was of counsel to Howard Law. He was only involved in the representation due to Howard Law's blanket authorization for other engagement counsel to tap into its network of local counsel. Morgan Drexen often did not distinguish between the various engagement-counsel firms.

### C.     Summary of the organization of the attorney network

Morgan Drexen provided administrative support and billing services for a network of attorneys throughout the United States. There were two categories of attorneys in the network: engagement counsel, whose role was to supervise Morgan Drexen and receive fees, and local counsel, whose role was to provide legal services in the jurisdiction in which each client lived. At first, Howard Law was the only engagement counsel, but eventually, a number of local counsel were "promoted" to engagement counsel.

Clients whom the network attorneys represented had an attorney-client relationship with the local counsel who actually provided the services, and the engagement counsel whose name appeared on the client's fee agreement and who received fees and supervised Morgan Drexen.

The pool of available local counsel was the same regardless of which attorney or firm acted as engagement counsel. This was the case even though each local counsel had a relationship only with Howard Law, not with any of the other engagement counsel. Morgan Drexen treated all engagement counsel as belonging to a single network, having identical access to the services of local counsel, notwithstanding the lack of any arrangement between the non-Howard Law engagement counsel and local counsel. Howard Law facilitated this confusion by allowing other engagement counsel to tap into its network. And it did so despite its current legal

---

[25] UST Ex. 21.

position that the other engagement counsel were its competitors and that Morgan Drexen harmed its economic interests by doing business with them.

### D. The client experience

Clients typically were attracted to the network through television advertisements for debt-resolution services.[26] The ads were created by Morgan Drexen.[27] The ads urged clients to call a telephone number. Callers were connected to a Morgan Drexen staff member, who performed the intake process on behalf of the relevant engagement-counsel firm.[28]

Once enrolled in the program, clients would authorize Morgan Drexen to make regular "automated check handling" (ACH) debits from their bank accounts.[29] Morgan Drexen accumulated funds in this manner to pay, as applicable, legal fees, bankruptcy filing fees, and payments to creditors who agreed to accept a partial-payment settlement. Some clients also enrolled in the so-called "legal assistance program" (LAP), essentially a $50 per month retainer arrangement that entitled the client to certain limited attorney services unrelated to the debt-resolution and bankruptcy programs.[30]

Morgan Drexen was the primary point of contact for clients of each engagement-counsel firm. Clients who wished to speak to their attorneys were told to call Morgan Drexen,[31] although the attorneys were able to contact the clients directly and sometimes chose to do so.[32] Clients sometimes struggled to gain an audience with an attorney. When one client arranged with Morgan Drexen for an attorney to call her, "the phone call would never come."[33] Morgan Drexen

---

[26] *See* UST Ex. 131 at 7:6-21; UST Ex. 129 at 11:10-25, 12:1-16.
[27] UST Ex. 5 at 3.
[28] *See* UST Ex. 129 at 12:5-16.
[29] UST Ex. 15 at 2.
[30] UST Ex. 26 at 11.
[31] Laura Leach trial test. April 5, 2017, at 10:30 a.m.
[32] *Id.*
[33] UST Ex. 130 at 20:13-24.

also handled billing questions.[34] Morgan Drexen's former employee Laura Leach testified that it was necessary for Morgan Drexen to act as the primary point of contact.[35] Otherwise, the attorneys would have been inundated with calls from clients.[36] This statement is plausible, and it sheds light on the sheer volume of clients that network attorneys handled, as well as the inevitable corollary—that the attorneys spent little time interacting with any one client. Indeed, attorney involvement with clients was so limited that, on at least one occasion, Graeff was assigned as engagement counsel to a client without his knowledge, and he did not discover that she was his client until she had found a new attorney and demanded a refund.[37]

For a debt-settlement client, Morgan Drexen would communicate with creditors and attempt to obtain an agreement to settle for less than the full amount of the client's debt to that creditor.[38] When a creditor was prepared to settle, Morgan Drexen would forward the proposed settlement to local counsel.[39] Local counsel would review the settlement and, with the click of a mouse, either accept or reject it.[40]

For a bankruptcy client, Morgan Drexen would prepare bankruptcy-filing documents, subject to attorney review, while waiting for the client to accumulate enough payments to fund the filing fee as well as the law firm's fee.[41]

Clients who enrolled in the LAP would also pay monthly fees for that program. These fees served as a retainer that the client paid whether or not she ever called upon local counsel to perform any LAP services.[42]

---

[34] *See, e.g.*, UST Ex. 7 at 8, 9, 12, 23.
[35] Trial test. April 5, 2017, 10:31 a.m.
[36] *Id.*
[37] Graeff trial test. April 3, 2017, 2:47 p.m.
[38] *See, e.g.*, UST Ex. 6 at 36 (log notes showing MD's communication with creditors to make settlement offers).
[39] *See, e.g.*, UST Ex. 6 at 34.
[40] UST Ex. 1 at 4; *see also, e.g.*, UST Ex. 6 at 21 (log note dated April 27, 2011, in which Graeff as local counsel accepts a settlement offer).
[41] UST Ex. 26 at 7.
[42] UST Ex. 26 at 11.

Page 10 – MEMORANDUM DECISION (NOT FOR PUBLICATION)

Morgan Drexen communicated with clients on behalf of engagement counsel using a standardized letterhead.

In summary, there were two categories of Oregon clients whose attorney-client relationships were mediated by Morgan Drexen. The first consisted of Oregon clients of Howard Law. They were enrolled in legal services through Morgan Drexen; they submitted payments through Morgan Drexen; and their communication was primarily if not exclusively with Morgan Drexen Staff. When attorney services were required, one of Howard Law's of-counsel attorneys in Oregon (Graeff, Loy, or Rennie) performed the services. When these clients remitted fees to Morgan Drexen, the fees were distributed in part to Howard Law and in part to local counsel. Howard Law in turn paid Morgan Drexen for its assistance. Morgan Drexen communicated with these clients on letterhead identifying Howard Law as having a relationship to the representation.

The second category consisted of clients of The Law Offices of Erik Graeff. They also enrolled in legal services through Morgan Drexen, submitted payments through Morgan Drexen, and communicated primarily if not exclusively with Morgan Drexen staff. When attorney services were required, Graeff ordinarily performed them himself, but he had the option of referring the services to one of Howard Law's of-counsel attorneys in Oregon, even though those attorneys had no agreement with Graeff. When these clients remitted fees to Morgan Drexen, the fees were distributed in part to Graeff and in part to local counsel, if any. Graeff in turn paid Morgan Drexen for its assistance. Morgan Drexen communicated with these clients on letterhead identifying Howard Law as having a relationship to the representation, even though in reality Howard Law had no such relationship.

Each of the three clients discussed below—Stites, Arthur, and Roberts—were Oregon residents throughout their representation by members of the network.[43] But there is no indication that any of the network's clients knew or cared about the relationships described here. The clients had little contact with anyone other than Morgan Drexen's administrative staff. The experiences of clients were similar regardless of which firm served as engagement counsel. At least one network client believed that she hired "Morgan and Drexen" and that Howard Law was "one of the attorneys that they had that was there."[44] Another client, whose engagement counsel was Graeff, testified that she intended to hire Graeff as her attorney and understood that he was her attorney.[45] There is no evidence that any client of Graeff labored under the mistaken impression that Howard or Howard Law represented her, or even that any such client was aware of the existence of Howard Law.

### E. Cheryl Stites

Stites called Morgan Drexen in September 2007 to obtain debt-resolution services. She initially signed up only for debt-settlement services, not bankruptcy services. But her agreement with Howard Law provided that bankruptcy services could be made available under a separate agreement for additional fees.[46] She discussed the possibility of bankruptcy with Morgan Drexen during the intake call and realized that bankruptcy was "the final process," i.e., that she could pursue bankruptcy if debt settlement failed.[47] Therefore, both Stites and Howard Law were aware at the time of the engagement that she might end up in bankruptcy, and the debt-settlement services were designed to avoid that outcome.

---

[43] Pretrial order, Ex. 1 at ¶¶ 125, 150; UST Ex. 150 at 2.
[44] UST Ex. 128 at 16:22-17:4.
[45] UST Ex. 31.
[46] UST Ex. 15 at 1.
[47] UST Ex. 128 at 11:5-15.

Stites's fee agreement with Howard Law provided, among other things, that Howard Law would "review and analyze relevant documents to determine [Stites'] legal rights and remedies pertaining to [her] Debt." The agreement also recited that Howard Law enlisted "outside companies" to perform some of its services,[48] referring to its outsourcing of tasks to Morgan Drexen.

Stites remained in the debt-settlement program for five years. During that time, she mentioned at least once to Morgan Drexen that she was considering abandoning debt settlement in favor of bankruptcy.[49] Morgan Drexen communicated with creditors about settlement offers and reviewed documents that she sent in.[50] Although Morgan Drexen's log notes show that staff members sent a number of proposed settlements to local counsel for review, there is no indication that any attorney acted on them until 2011, when Graeff approved a settlement with Chase.[51] Graeff also provided limited-scope litigation services to Stites under a separate agreement in a lawsuit by a debt collector.[52] The suit was unsuccessful for Stites, and the collector obtained a judgment.[53]

In 2012, after the judgment creditor began garnishment, Stites called Morgan Drexen and asked to switch to the bankruptcy program.[54] She then cancelled her enrollment with Howard Law.[55]

At this point, apparently, Graeff became Stites's engagement counsel, although she did not sign a separate fee agreement with him.[56] Rennie, evidently acting for Graeff by way of

---

[48] UST Ex. 15 at 1.
[49] Pretrial order, Ex. 1 at 12, ¶ 73.
[50] *E.g.*, UST Ex. 6 at 35-36.
[51] UST Ex. 6 at 15.
[52] UST Ex. 19.
[53] Pretrial order, Ex. 1 at 17, ¶ 107.
[54] UST Ex. 6 at 14.
[55] UST Ex. 6 at 2.
[56] Pretrial order, Ex. 1 at 19, ¶ 116.

Howard Law's blanket local-counsel-sharing authorization, was her counsel of record in her bankruptcy case, which was finally filed in September 2014.[57]

In summary, Stites enrolled in representation by Howard Law, through Morgan Drexen, for debt-settlement services, with bankruptcy treated as a back-up option. She stayed in and paid for the debt-settlement program for several years, but it ultimately failed to resolve her debt problems. She then decided to file for bankruptcy with Graeff and Rennie acting as her attorneys independently of Howard Law.

### F. Kathleen Arthur

Arthur saw a Morgan Drexen TV ad, and she called to request bankruptcy services.[58] She enrolled for bankruptcy services with The Law Offices of Erik Graeff[59] in January 2013.[60] She did not express any interest in nonbankruptcy services,[61] but she also enrolled in the LAP.[62] Her fee agreement makes clear that she was Graeff's client, but he testified that he was unaware of the agreement or that she was his client.[63]

Arthur did not have any agreement with[64] or pay any money to[65] Howard Law.

Eventually, Arthur grew dissatisfied with Graeff and, through new counsel, demanded a refund.[66] He testified that her demand letter was the first inkling he had that she had ever been a

---

[57] UST Ex. 150.
[58] UST Ex. 129 at 11-13.
[59] UST Ex. 20.
[60] Pretrial order, Ex. 1 at 21, ¶ 128.
[61] UST Ex. 129 at 13.
[62] UST Ex. 36.
[63] Trial test. April 3, 2017, 2:47 p.m.
[64] Pretrial order, Ex. 1 at 21, ¶ 129.
[65] Pretrial order, Ex. 1 at 23, ¶ 144.
[66] UST Ex. 24.

client of his.[67] He denied that he had overcharged her,[68] but he issued a partial refund,[69] which she did not cash.[70]

Arthur filed her bankruptcy petition through pro bono counsel with no involvement by Graeff, Morgan Drexen, or Howard Law.[71]

### G.    *Mary Ann Roberts*

Roberts saw a TV ad featuring Graeff. In August 2014,[72] she called in response to it and spoke to Morgan Drexen.[73] She told Morgan Drexen that she had net income of only $9 a month after deducting expenses, and her son had been buying groceries for her.[74] She also said that, in order to initialize the ACH process, she would have to put $1 into her bank so that the withdrawal would not be rejected.[75]

Even though Roberts wanted only bankruptcy services, not debt-settlement services, Morgan Drexen sent to her and directed her to fill out paperwork for enrollment in debt-consolidation as well as bankruptcy services.[76] She argued with a Morgan Drexen representative about the need to fill out the debt-consolidation paperwork. The representative told her that it was "just their procedure" to have clients complete the debt-consolidation forms.[77]

Roberts signed agreements for debt-resolution services, bankruptcy services, and the LAP.[78] Her engagement counsel was The Law Offices of Erik Graeff.[79] Again, Graeff testified

---

[67] Trial test. April 3, 2017, 2:47 p.m.
[68] UST Ex. 25
[69] Pretrial order, Ex. 1 at 23, ¶ 147.
[70] Pretrial order, Ex. 1 at 23, ¶ 148.
[71] Pretrial order, Ex. 1 at 23, ¶ 149; UST Ex. 151.
[72] UST Ex. 7 at 32.
[73] Pretrial order, Ex. 1 at 23, ¶ 151.
[74] Pretrial order, Ex. 1 at 24, ¶ 153.
[75] Pretrial order, Ex. 1 at 24, ¶ 154.
[76] UST Ex. 130 at 11:19-24.
[77] UST Ex. 130 at 15:16-20.
[78] UST Ex. 26.
[79] *Id.*

that he did not know she was his client and did not agree to represent her.[80] Altogether, she paid $1,465 through Morgan Drexen to The Law Offices of Erik Graeff.[81] That sum included $50 per month in LAP fees, which would be reduced to $17.50 per month upon the filing of a bankruptcy petition or a definitive decision not to file.[82]

The LAP fee was a retainer that guaranteed Graeff's availability to perform eight services for Roberts: (1) an initial phone consultation and an initial in-person consultation "for each new legal matter"; (2) review of a single six-page document per month; (3) preparation of a will, but only after four months' enrollment; (4) assistance to her in representing herself in two small-claims matters each year; (5) a letter per month and a follow-up letter if necessary, if Graeff "deems it meritorious"; (6) two phone calls per month if Graeff "deems it meritorious"; (7) assistance in "following up with creditors" after debt-settlement or a bankruptcy discharge, but specifically excluding "credit repair"; and (8) preparation of two "simple" documents each month, such as a bill of sale for a car or a rental agreement.[83] She expressed no interest in these services, and with the possible exception of "following up with creditors," the services had no meaningful relationship to the bankruptcy services that were her sole reason for enrolling. She did not avail herself of any of the described services, and there was no plausible reason to expect that she would. The LAP provided no value to her.

In January 2015, after just over three months' enrollment in the program, Roberts called to ask Morgan Drexen about the status of her file.[84] Morgan Drexen's representative explained that her petition would be filed once she accumulated enough money to pay all associated fees,

---

[80] Trial test. April 3, 2017, 2:47 p.m.
[81] Pretrial order, Ex. 1 at 24, ¶ 155.
[82] Pretrial order, Ex. 1 at 25, ¶ 161.
[83] UST Ex. 26 at 11.
[84] Pretrial order, Ex. 1 at 26, ¶ 165; UST Ex. 7 at 22.

and that she had $354 to go.[85] If her $50 monthly LAP fee had been dedicated instead to paying

for the bankruptcy services she wanted, it would have taken significantly less time for her to

accumulate sufficient funds to file a bankruptcy petition.

What Roberts did not know was that Graeff had recently decided to withdraw from the

Morgan Drexen network. Graeff had discovered, in connection with the Arthur case, that Morgan

Drexen had accepted clients on his behalf without his knowledge.[86] In December 2014, he sent a

letter to Morgan Drexen's general counsel, Jeffrey Katz, instructing Katz to terminate Graeff's

contract and his relationship with "Howard Law or any other network attorney."[87] Graeff sent

this letter before he was aware that Roberts was his client.[88] Graeff did not send this letter to

Howard Law, because he assumed Katz would share it with Howard Law.

Around late 2014 to early 2015, Rennie departed the Morgan Drexen network as well.[89]

On February 10, 2015, Graeff sent letters to his network clients, including Roberts,

telling them that he would no longer be representing them and that he expected Morgan Drexen

to furnish substitute counsel.[90] Some clients chose to remain Graeff's clients with no further

involvement by Morgan Drexen.[91] Roberts decided against this option because Graeff told her

that she would lose what she had already paid through Morgan Drexen and would have to start

from the beginning in paying his fees.[92]

Roberts learned from Morgan Drexen that her new attorney would be Loy.[93] When she

talked to Loy in February 2015, he told her that he could not help her with bankruptcy because

---

[85] Pretrial order, Ex. 1 at 26, ¶ 165; UST Ex. 7 at 22.
[86] Graeff trial test. April 3, 2017, 2:47 p.m.
[87] UST Ex. 8.
[88] Graeff trial test. April 3, 2017, 2:48 p.m.
[89] Pretrial order, Ex. 1 at 9, ¶ 48.
[90] UST Ex. 9; tr. test. April 3, 2017, 2:50 p.m.
[91] Graeff trial test. April 3, 2017, 2:50 p.m.
[92] UST Ex. 130 at 37-38.
[93] UST Ex. 130 at 38:16-19.

he wasn't a bankruptcy lawyer.[94] Loy did opine, however, that she might not need bankruptcy relief because her only income was from Social Security benefits, which creditors could not attach.[95]

Eventually, Morgan Drexen gave Roberts the name of another network attorney, Rennie, whom she never managed to contact,[96] probably because he was no longer with the network.

For some time, Roberts received no other information from Morgan Drexen about any attorney that might be handling her case.[97] Morgan Drexen had in fact "transferred" her file to Howard Law, although she was unaware of this change and did not authorize any ACH debits on behalf of Howard Law.[98] She did not know who was representing her except that the representation was "through Morgan Drexen."[99] In February 2015, when Graeff sent his mass-mailing to clients informing them that Morgan Drexen would connect them with a new lawyer, he also transferred about $50,000 from a lawyer trust account in his firm's name to one in the name of Howard Law.[100] That transfer was of funds that Graeff held in trust for his network clients. When he parted with the clients, he delivered their payments to Howard Law.

After the "transfer," Morgan Drexen's work on Roberts's file continued without any apparent interruption.[101] Morgan Drexen's paralegals continued to collect information from her and prepare the necessary documents for her bankruptcy filing. Laura Lopez, a Morgan Drexen employee, told Roberts in late April 2015 that she would "attempt to submit [Roberts'] case for

---

[94] UST Ex. 130 at 38:19-21.
[95] UST Ex. 130 at 38:24-39:3.
[96] UST Ex. 130 at 39:15-25.
[97] UST Ex. 130 at 40:3-5.
[98] UST Ex. 130 at 25:17-19.
[99] UST Ex. 130 at 25:20-25.
[100] UST Exs. 56, 57; pretrial order, Ex. 1 at 7, ¶ 38.
[101] *See* UST Ex. 7 at 10-19 (log notes covering the transition period).

review in May."[102] I interpret this statement to mean that Lopez would attempt to assemble her bankruptcy-filing documents in a form suitable for review and filing by a lawyer.

At the end of April 2015, Morgan Drexen removed Rennie's name from its available pool of local counsel due to his departure from the network. The only remaining network member who was licensed in Oregon was Loy. Thus, Morgan Drexen's software automatically replaced Rennie with Loy as local counsel to Roberts. The replacement caused a letter to be generated with Howard's signature printed on it, and the letter was sent to her.[103] It said that she was "engaged in bankruptcy services with Howard Law, P.C.," Loy would be her attorney, and she had seven days to respond in writing if she did not approve Loy's assignment to her file.[104] There's no evidence that Howard was aware of this letter before it was sent. The statement that Loy would be Roberts's attorney was false. Loy had already refused to provide bankruptcy services to her. But the letter was consistent with Morgan Drexen's standard practice of communicating with clients on Howard Law's behalf, and there is no evidence that Howard Law anticipated the problem or tried to prevent it.

Roberts wrote back, saying that she had spoken to Loy, knew that he would not handle her case, and did not approve of the reassignment.[105] She requested an attorney in her geographical area who would provide bankruptcy services.[106]

Roberts continued to communicate with Lopez. The log notes show that they discussed the continuing lack of an attorney to handle the case, her need to pay sufficient funds before any attorney could file a bankruptcy petition, and the LAP fee. She questioned the necessity of the

---

[102] UST Ex. 7 at 10.
[103] Leach trial test. April 5, 2017, 10:51 a.m.
[104] UST Ex. 29.
[105] UST Ex. 30.
[106] *Id.*

LAP. Lopez discussed the LAP with her and apparently persuaded her to remain enrolled in the LAP.[107]

Finally, at the end of June 2015, Roberts sent an email to Morgan Drexen representatives telling them that she demanded either an attorney who would file her bankruptcy petition or a full refund.[108] According to the log notes, she agreed to give Morgan Drexen "a couple more months" to provide her with an attorney.[109]

Meanwhile, the network continued to deteriorate. A Howard Law employee informed Roberts on July 1 that Howard Law no longer employed Morgan Drexen, and all administrative services would now be provided by firm staff.[110] The next day, Howard Law informed her that it was waiting on information from an Oregon attorney and suggested that she would soon have a lawyer.[111]

In late July, a staff member at Howard Law finally managed to find an attorney, Heather Brann, who was willing to represent Roberts in her bankruptcy.[112] Brann entered into a separate agreement with her and did not become a member of Howard Law.[113] But Howard Law's paralegals worked with Brann, and Howard Law invoiced Brann for paralegal services.[114] Brann did not pay.[115] Howard Law paid Brann's firm $1,689 for fees and costs related to the Roberts filing.[116]

---

[107] UST Ex. 7 at 9.
[108] UST Ex. 130 at 43:4-10; UST Ex. 7 at 8.
[109] UST Ex. 7 at 8.
[110] Pretrial order, Ex. 1 at 31, ¶ 192; UST Ex. 7 at 7.
[111] Pretrial order, Ex. 1 at 31, ¶ 193.
[112] Pretrial order, Ex. 1 at 31-32, ¶¶ 194-95.
[113] Pretrial order, Ex. 1 at 31-32, ¶ 195.
[114] Pretrial order, Ex. 1 at 33, ¶¶ 200-02.
[115] Pretrial order, Ex. 1 at 33, ¶ 202.
[116] Pretrial order, Ex. 1 at 33, ¶ 201.

According to Morgan Drexen's log notes regarding Roberts,[117] on July 20, Howard Law paralegal Monica Rodriguez sent Brann a "petition draft" for Roberts and asked Brann to "revise and advise if any changes need to be made on the petition draft." On July 27, Brann emailed Rodriguez, saying "[w]e may have changes but I'd like to discuss the petition with the client first."[118] On July 31, Rodriguez noted an incoming communication regarding the speaker's communications with Roberts; from the context, I infer that the speaker is Brann. Brann told Rodriguez that Brann had had an "intake call" with Roberts, and Brann would have "a few follow up items that we will need to address to be ready to file." The log note entry then listed six changes or comments, none of which addressed Howard Law, Graeff, or information for item 9 on the required statement of financial affairs (SoFA).[119] An August 20 log note by Rodriguez reports an apparent communication from Brann saying that Roberts's petition "is now ready to file"[120] and an apparent reply by Rodriguez to Brann, saying that Rodriguez had made document changes requested by Brann and asking whether Brann required any further changes before Rodriguez would "send the docs out to the client for wet signatures."[121] On or after August 24, Rodriguez mailed the draft bankruptcy documents, including the SoFA, to Roberts to sign.

Brann eventually signed a stipulation for entry of an order requiring her to refund fees and imposing additional sanctions.[122] In the stipulation, she admitted responsibility for failing to disclose the true nature of the fee arrangements in Roberts's case.[123]

---

[117] Pretrial order, Ex. 1 at 31-32, ¶ 195.
[118] Pretrial order, Ex. 1 at 32, ¶ 196.
[119] Pretrial order, Ex. 1 at 32, ¶ 197.
[120] Pretrial order, Ex. 1 at 32-33, ¶ 198.
[121] Pretrial order, Ex. 1 at 33, ¶ 199.
[122] Howard Ex. 256.
[123] *Id.* at 8-9.

## IV.   Legal analysis

### A.   *Jurisdiction*

These adversary proceedings arise under the Bankruptcy Code and are related to the bankruptcy cases of Stites, Arthur, and Roberts. The court has jurisdiction under 28 U.S.C. §§ 157 and 1334. These are core proceedings under section 157(b)(2)(A). No party has disputed the constitutional authority of this court to enter final judgment in these actions.

### B.   *Agency*

In many of its claims, the UST seeks to hold Howard Law liable for the acts of Graeff and Morgan Drexen while Howard Law was acting as Graeff's agent. Howard Law argues that it is liable for acts of Graeff that were committed while he was acting in his of-counsel capacity to Howard Law, but not for other acts of Graeff.[124] I agree.

Graeff's local-counsel engagement letter made clear that his own separate clients did not become Howard Law's clients. He acted on behalf of Howard Law only when servicing clients of Howard Law. Likewise, Morgan Drexen acted as Howard Law's agent only when servicing Howard Law's clients, not when servicing Graeff's clients.

The UST argues that Graeff could bind Howard Law because his relationship with Howard Law created the appearance of authority.[125] As the UST acknowledges, the existence of vicarious liability for the acts of an of-counsel lawyer depends on "the terms of the of-counsel relationship and the extent of the lawyer's affiliation to the firm apparent to the lawyer's clients."[126] This principle is consistent with the law of apparent authority that a person is liable, notwithstanding the lack of actual authority, for the acts of either a nonagent who appears to be

---

[124] Howard Posttrial Br. at 30 *et seq.*
[125] Plaintiff United States Trustee's Closing Argument [120] (UST First Posttrial Br.) at 11 et *seq.*
[126] *Id.*

an agent or an agent who has exceeded the agent's actual authority.[127] Apparent authority exists

only when the principal has engaged in "some conduct . . . which, when reasonably interpreted,

causes a third party to believe that the principal consents to have the apparent agent act for him

on that matter."[128] The putative agent cannot exercise binding apparent authority absent some

affirmative step on the principal's part. Even when the principal has done something to create an

appearance of authority, the third party must actually and reasonably rely on the principal's

representation of agency.[129] By listing Graeff on its website as an associate, Howard Law

arguably engaged in conduct that could give a reasonable appearance of agency. A client who

knows what an "associate" of a law firm is might have thought that Graeff was a full-time

employee of Howard Law and therefore that the client was a client of both Graeff and Howard

Law. But because there is no evidence that any client actually had this misimpression, I cannot

conclude that Graeff exercised apparent authority for Howard Law when he serviced his own

separate clients.

The UST makes two additional, related arguments that Howard and Howard Law should

be liable for the acts of Graeff and of Morgan Drexen as Graeff's agent. First, the UST suggests

that the distinction between Howard Law and the other engagement-counsel firms (including

Graeff's) was illusory. The UST has convincingly demonstrated that Morgan Drexen treated the

separate engagement-counsel firms as interchangeable and as members of a single network.

Morgan Drexen used letterhead including Howard Law's name even on letters addressed to

clients of other engagement-counsel firms. Morgan Drexen seamlessly transitioned Roberts from

Graeff as engagement counsel to Howard Law as engagement counsel. The client experience

(mediated solely through Morgan Drexen) was apparently identical regardless of which firm

---

[127] *Harkness v. Platten*, 359 Or. 715, 721-22 (2016) (citing Restatement (Third) of Agency § 2.03 cmt a).
[128] *Id.* at 721 (internal citations omitted).
[129] *Id.* at 722 (internal citations omitted).

acted as engagement counsel for a particular client. Howard Law added to the confusion by permitting Morgan Drexen to assign its of-counsel members to work on files belonging to other engagement counsel. Even Graeff admitted that the relationship among the network members was obscure to him. Nevertheless, the fact remains that The Law Offices of Erik Graeff has always been an entity separate from Howard Law.

The UST's second argument that Howard Law should be liable for the acts of Morgan Drexen and Graeff is that Howard was the "guiding spirit" of the Morgan Drexen network.[130] The guiding-spirit principle permits imposition of liability on the head of an enterprise for the actions of the enterprise, even though the acts were carried out by subordinates.[131] In essence, guiding-spirit liability is the inverse of ordinary agency; instead of holding a corporation (as principal) liable for the acts of its officer (as agent), the court holds the "guiding spirit" officer liable for the acts of the corporation. The concept of the guiding spirit does not permit imposition of liability on a person who is neither agent nor principal with respect to the act or transaction at issue. Therefore, this doctrine does not permit circumvention of the limitations on agency law discussed above. Moreover, an officer is only a "guiding spirit" with respect to acts "which he authorizes or directs or in which he participates [.]"[132] The UST hasn't shown that Howard directed, participated in, or even knew about Graeff's acts in connection with his separate clients.

### C.     General overview of section 526

Section 526 imposes obligations on debt-relief agencies and prescribes remedies for violations of those obligations. Subsection (a) describes prohibited conduct; subsection (a)(1) prohibits an agency's failure to perform a service that the agency informed an assisted person

---

[130] UST First Posttrial Brief at 20-22.
[131] *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069-70 (9th Cir. 2016) (affirming personal liability of corporate officer for activities of the corporation carried out under his instructions).
[132] *Id.* at 1069.

that the agency would provide in connection with a case; subsection (a)(2) prohibits an agency from counseling or advising an assisted person to make an untrue or misleading statement in a bankruptcy document; and subsection (a)(3) prohibits an agency from making any misrepresentation to an assisted person with respect to service that the agency will provide to the assisted person. Subsection (a) defines violations in strict terms; it contains no scienter or state-of-mind element.

Subsection (c) describes the consequences of a violation of subsection (a), including the available remedies and the criteria for obtaining each remedy. If the court, on the motion of the UST, finds that a person intentionally violated section 526 or engaged in a clear and consistent pattern or practice of violating it, the court may enjoin violation of section 526 or impose an appropriate civil penalty against the person.

Howard has advanced several arguments that his innocent state of mind absolves him of liability for an alleged violation. I disagree; his state of mind is irrelevant to the existence or nonexistence of a violation, although it is relevant to whether I may award a remedy for the violation, as discussed in part IV.J below.

### D.   *Generally applicable definitions*

"Debt relief agency" means, with exceptions not relevant here, a person who provides bankruptcy assistance to an assisted person in return for money or other valuable consideration.[133]

"Bankruptcy assistance" means goods or services provided to an "assisted person" with the purpose (express or implied) of providing information, advice, counsel, document preparation, filing, or attendance at a creditors' meeting, or appearing in a case or proceeding on

---

[133] Section 101(12A)(A)-(E).

someone else's behalf or providing legal representation with respect to a bankruptcy case or proceeding.[134]

An "assisted person" is one whose debts are primarily consumer debts and whose nonexempt property is less than a stated dollar amount (adjusted annually, currently $192,450 but not relevant to any disputed issue here).[135]

### E. First category of claims: section 526(a)(3), misrepresentation of services

Section 526(a)(3) bars certain misrepresentations by a debt-relief agency. To be liable under that subsection, the defendant must be a debt-relief agency, the defendant must make a misrepresentation to an assisted person or prospective assisted person, the misrepresentation may be direct or indirect and may be affirmative or by material omission, and the misrepresentation must be with respect to the service that the agency will provide or the benefits and risks that may result if the person becomes a debtor.

The UST alleges in its second claims for relief in the Stites,[136] Arthur,[137] and Roberts[138] actions that Howard Law violated section 523(a)(3) by misrepresenting the services that Howard Law would perform for those clients.

### 1. Stites

#### (a) The misrepresentation claim in the Stites action isn't time-barred.

Howard Law argues that the statute of limitation in 28 U.S.C. § 1658 bars the UST's claim. Under section 1658, a civil action to enforce a federal statute must be commenced within

---

[134] Section 101(4A).
[135] Section 101(3).
[136] Pretrial order, Ex. 2 at 2, ¶ 1.
[137] Pretrial order, Ex. 2 at 5, ¶ 1.
[138] Pretrial order, Ex. 2 at 8, ¶ 1.

four years after the claim accrues. Because the alleged misrepresentations occurred more than four years before the UST filed its complaint, Howard Law argues that the claim is time-barred.

Section 526's prohibitions apply to a "debt-relief agency." To be a debt-relief agency, a person must provide "bankruptcy assistance."[139] Under section 101(4A), for services to be bankruptcy assistance, they must be "with respect a case or proceeding under" the Bankruptcy Code.[140] I interpret that phrase in section 101(4A) to refer to an actual bankruptcy case, even if commenced later, rather than to the possibility of a prospective case that is never filed. Thus, the existence of a case or proceeding is an element of a section 526 claim, and the section 1658 limitations period cannot begin to run before the assisted person files a bankruptcy petition.

Stites filed her petition in September 2014, within four years before the UST filed its complaint in the Stites case. The claim isn't time-barred.

### (b)   *Howard Law was a debt-relief agency with respect to Stites.*

Howard Law provided services to Stites. She was an assisted person. It provided the services with the purpose of providing at least advice, counsel, and document preparation. Howard also provided legal representation.

Howard Law denies that its services to Stites were provided "with respect to" a bankruptcy case, because the alleged misrepresentations occurred long before she filed her bankruptcy petition.[141] The UST contends that the services were "with respect to" a bankruptcy case because the alleged misrepresentations were provided as part of a program in which Stites enrolled in the hope of avoiding bankruptcy.[142]

---

[139] Section 101(12A).
[140] Section 101(4A).
[141] Howard Trial Brief [82] at 9.
[142] UST First Posttrial Br. at 23-24.

The UST cites the Supreme Court's 1933 decision in *Conrad, Rubin & Lesser v. Pender*[143] for the proposition that services provided in the hope of avoiding bankruptcy are "in contemplation of" bankruptcy. Although the Court was construing the phrase "in contemplation of," rather than section 526's "with respect to," *Conrad* supports the conclusion that services designed to prevent bankruptcy may be "with respect to" a bankruptcy case if (1) they are provided with the conscious understanding that there may be a bankruptcy case in the assisted person's future, (2) the services have a meaningful relationship to the contemplated bankruptcy, and (3) the assisted person in fact files a bankruptcy petition.

Here, Howard Law and Stites both recognized that she might need to file bankruptcy; it offered its services to resolve her debt without resort to bankruptcy; and she did eventually file bankruptcy. Therefore, the services were "with respect to" her eventual bankruptcy case. Howard Law provided the services in exchange for money, so it was a debt-relief agency with respect to her.

### (c) *Howard Law made no misrepresentation to Stites.*

The UST alleges two misrepresentations by Howard Law to Stites: that it could legally provide legal assistance to her[144] and that it would review and analyze the documents she provided to determine her rights and remedies in relation to her debts.[145]

Howard Law did not affirmatively represent to Stites that it could legally assist her. But undertaking to assist necessarily constituted a representation that it had the legal ability to do so. If Howard had told Stites that he personally could represent her, it would have been false; he wasn't authorized to practice law in Oregon. Howard Law's statement that it, as a firm, could

---

[143] *Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 479 (1933).
[144] Pretrial order, Ex. 2 at 2, ¶ 1.
[145] *Id.*

represent her was true. Graeff, an Oregon-licensed attorney, was assigned to handle her representation. Graeff was then an of-counsel member of Howard Law.

If the UST is arguing that Howard Law's description of its services was false because it later failed to perform the services or performed them inadequately, its argument is better addressed under section 526(a)(1), and I address it below. But if the UST is arguing that Howard Law misrepresented its services because Morgan Drexen—rather than an attorney—performed the services, the argument fails. The agreement that Stites signed said that Howard Law would use the services of "outside companies." Moreover, Graeff did take some part in the review of her documents. The representation wasn't false.

Howard Law did not violate section 526(a)(3) claim in the Stites case.

### 2. Arthur

Arthur was a client of Graeff and The Law Office of Erik Graeff. She wasn't a client of Howard or Howard Law. As explained above, Graeff did not act as an agent of Howard Law when he was representing his own firm's clients. Nor did Morgan Drexen act on behalf of Howard Law when it was acting on behalf of Graeff's firm.

Howard Law wasn't a debt-relief agency, and did not violate section 526(a)(3), with respect to Arthur.

### 3. Roberts

#### *(a) Howard Law was a debt-relief agency with respect to Roberts.*

Howard Law provided services to Roberts (an assisted person) after Graeff "transferred" clients to Howard Law. During most of the time when Howard Law handled her file, she expressed an intention to file bankruptcy, and it collected fees and prepared documents in relation to that prospective bankruptcy. Those services were "with respect to" the future case.

Howard Law disputes that it received payment from Roberts, because it forwarded to Brann more than the amount of money that Howard Law received from Brann.[146] I disagree. Howard Law also received from Graeff money in connection with Roberts's file, and that amount exceeded what Howard Law paid to Brann. In any case, section 526 does not say that the debt-relief agency must keep the money it receives from the assisted person, only that it must provide services "in exchange for" money. Howard Law received payment in exchange for services, and it was a debt-relief agency with respect to Roberts.

### (b)     *Howard Law made a misrepresentation to Roberts.*

For most of the alleged misrepresentations to Roberts, the analysis is the same as for Arthur: the representations were made by or on behalf of Graeff and his law firm, not Howard Law.

But the UST identifies three representations that (if made at all) are attributable to Howard Law: (1) the representation in the April 29, 2015, letter that Loy would provide bankruptcy representation to Roberts,[147] (2) the implied representation that Howard Law was legally able to represent Roberts,[148] and (3) the alleged representation that Roberts had to continue paying the $50-per-month LAP fee or lose the money she had paid toward bankruptcy services.[149]

### (1)     Howard Law and Howard misrepresented that Loy would be Roberts's bankruptcy lawyer.

In the April 29 letter, Howard represented to Roberts that Loy would be her lawyer. He concedes that the statement was false, but he offers three defenses: (1) the statement was

---

[146] Howard Posttrial Br. at 58.
[147] Pretrial order, Ex. 2 at 9, ¶ 1(h).
[148] Pretrial order, Ex. 2 at 9, ¶ 1(i).
[149] Pretrial order, Ex. 2 at 9, ¶ 1(j).

inadvertent,[150] (2) she did not rely on it because she already knew that Loy would not represent her,[151] and (3) Morgan Drexen wasn't authorized to send the letter.[152]

Neither Howard Law nor any of its agents deliberately chose to send the April 29 letter, which Howard Law argues absolves it of any violation.[153] But, as discussed above, Howard Law's intent or lack thereof isn't relevant to whether it violated section 526.

The evidence supports Howard Law's argument that Roberts did not rely on the letter; she said in a subsequent letter that she already knew that Loy would not be her attorney. But Howard Law points to no basis for inferring a reliance element in section 526. It argues only that common-law misrepresentation includes such an element.[154] The structure of section 526(a)(3) is inconsistent with the notion that Congress meant to import the elements of the common-law cause of action for misrepresentation. This isn't an action by Roberts under section 526(a)(2) to recover her actual damages; instead, the UST as plaintiff seeks civil penalties and an injunction to punish and deter violations, not to compensate an assisted person. There is no reason to read a reliance element into the statute where Congress has chosen to omit it.

The absence of Howard Law's authorization for Morgan Drexen to send the letter would be a defense. But, in fact, Howard Law authorized Morgan Drexen to manage its files and communicate with clients; indeed, Morgan Drexen was the primary and often exclusive point of contact with Howard Law's clients. It was part of Morgan Drexen's normal protocol to send clients a message upon the reassignment of local counsel. Having authorized Morgan Drexen to communicate with clients on behalf of Howard Law—even to sign Howard's name to automatically generated letters—Howard Law cannot now be heard to complain that the system

---

[150] Howard Posttrial Br. at 45.
[151] *Id.* at 44.
[152] Pretrial order, Ex. 2 at 9-10.
[153] Howard Posttrial Br. at 45.
[154] Howard Posttrial Br. at 45.

on which it permitted its agent to rely malfunctioned in this particular instance. It is bound by its general authorization.

None of Howard's three defenses is legally and factually sufficient. The April 29 letter was a misrepresentation by Howard Law and Howard under section 526(a)(3).

### (2) Howard Law did not misrepresent that it was able to provide services to Roberts.

After Loy refused to take on representation of Loy, it must have been obvious to Howard Law that no other member of the firm was able to handle the representation. Howard Law had no Oregon-licensed bankruptcy attorneys in its local-counsel network. Although Howard Law continued to charge Roberts ostensibly for legal services when it had no attorney who was willing and able to take her case, it was open about its lack of an attorney—with the exception of the misrepresentation in the April 29 letter. It did not misrepresent that it was able to provide services to Roberts.

### (3) Howard Law did not represent that Roberts had to continue paying the $50 per month LAP fee or risk losing the money that she had paid toward bankruptcy services.

It does not appear that Howard Law or Morgan Drexen represented to Roberts that she had to continue paying the $50 per month LAP fee or risk losing the money that she had paid toward bankruptcy services. The UST argues that Morgan Drexen told Roberts during the intake process that she had to enroll in the LAP.[155] Even if Morgan Drexen had made that statement, it was then working for Graeff, not Howard. The UST also argues that Morgan Drexen later told Roberts that she had to continue paying the LAP fee until her bankruptcy petition was filed.[156] The log notes are not quite consistent with this argument. Instead, they show that Morgan

---

[155] UST First Posttrial Br.at 59-60.
[156] UST First Posttrial Br. at 60.

Drexen employee Julie Start "suggested" that Roberts remain enrolled in the LAP until obtaining a discharge, and Roberts accepted the suggestion.[157] The evidence does not reveal Start's reason for making this suggestion, but it does not appear to have constituted a representation that Roberts was required to remain in the LAP.

### F.    Second category of claims: section 526(a)(1), failure to perform services

To violate section 526(a)(1), a defendant must be a debt-relief agency, inform an assisted person or prospective assisted person that the defendant would perform a service "in connection with" a bankruptcy case or proceeding, and fail to perform the service.

In the UST's fourth claims for relief in the Stites,[158] Arthur,[159] and Roberts[160] actions, the UST claims that Howard Law violated section 526(a)(1) by failing to perform services that it agreed to perform for those clients.

### 1.    Howard Law did not fail to perform services in the Stites case.

As discussed above, Howard Law was a debt-relief agency with respect to Stites. It informed her that it would perform services for her. The prospective services were in connection with her bankruptcy case for the same reasons that they were "with respect to" her bankruptcy case, as discussed above: the services were promised for the purpose of debt resolution to avoid bankruptcy and with the understanding that a bankruptcy case might be in her future.

The service that the UST alleges Howard Law failed to perform was to "review and analyze relevant documents to determine her legal rights and remedies pertaining to her unsecured debts, including without limitation the Chase Debt."[161] Howard Law did inform Stites that it would perform this service.

---

[157] UST Ex. 7 at 8.
[158] Pretrial order, Ex. 2 at 3, ¶ 1.
[159] Pretrial order, Ex. 2 at 6, ¶ 1.
[160] Pretrial order, Ex. 2 at 8, ¶ 1.
[161] Pretrial order, Ex. 2 at 3, ¶ B.1.

The UST makes two arguments in support of the contention that it failed to perform this service: (1) four years elapsed before Stites had any contact with an attorney, and she was otherwise left to her own devices, assisted only by Morgan Drexen staff members; and (2) even when an attorney did take action, the work performed was ineffectual, unhelpful, and overpriced.

The slow pace at which representation of Stites proceeded—particularly the lack of significant attorney involvement in the early stages of the representation—does not support a conclusion that Howard Law failed to provide the services it proposed to provide. Granted, by analogy to contract law, there must be some point at which a delay in the provision of services crosses the line into a total failure to provide services.[162] But Morgan Drexen staff members undertook to analyze documents that Stites had provided, and they did so within the first few months of Howard Law's engagement.

The quality of services performed by a debt-relief agency may sometimes be so low as to justify a finding that the agency failed to perform altogether.[163] But Howard Law's undertaking to Stites was to "review and analyze relevant documents to determine [Stites'] legal rights and remedies pertaining to [her] Debt." Howard Law didn't undertake to resolve her debt problems, take any particular approach to resolving them, or even explore or pursue any "remedies" once it had "determined" them. The UST argues that the quoted provision "implied an attorney's analysis and judgment."[164] Perhaps so, but Graeff was involved at least occasionally in the analysis of documents and the determination of rights and remedies. Howard Law's performance fell short of Stites's reasonable expectations, but the quality of services wasn't so poor as to constitute a total failure to perform.

---

[162] 23 Williston on Contracts § 63:18 (4th ed. 2002) ("An unreasonable delay in performance constitutes a material breach" of contract).
[163] 23 Williston on Contracts § 63:4 (4th ed. 2002) ("a breach whose character is such that the nonbreaching party is substantially deprived of the benefit of his or her bargain should [be considered a] total breach").
[164] UST First Posttrial Brief at 64.

### 2. Howard Law did not fail to perform services in the Arthur case.

For the reasons stated above, Howard Law wasn't a debt-relief agency with respect to Arthur.

### 3. Howard Law did not fail to perform services in the Roberts case.

Howard Law argues that the only service that Roberts asked it to perform was to connect her with a bankruptcy attorney in Oregon. It eventually did so by connecting her with Brann.[165]

The relevant question isn't what services Roberts requested, but rather what services Howard Law informed her that it would perform. The UST alleges that Howard Law informed her that it would perform the following four services (and then failed to do so): (1) timely completion of her bankruptcy documents, (2) keeping her informed of the progress of her bankruptcy matter, (3) providing bankruptcy services through the agency of Loy, and (4) timely providing her with an Oregon attorney who could assist her with her bankruptcy filing.[166]

Morgan Drexen's paralegal Laura Lopez informed Roberts that she would review Roberts's documents and "attempt" to "submit the case" in May 2015. Lopez did in fact review the documents. It is impossible to say for certain whether she "attempted" to submit the file to an attorney. It's debatable whether promising to "attempt" to do something constitutes a prospective service. But even if it does, the evidence is insufficient to prove that she did not do so.

There is no evidence that either Howard Law or Morgan Drexen informed Roberts that they would keep her informed of the progress of her bankruptcy matter. In any case, Morgan Drexen log notes reflected that its staff members had many conversations with her on the progress of her bankruptcy matter.

---

[165] Howard Posttrial Br. at 51.
[166] Pretrial order, Ex. 2 at 10, ¶ 1.

I have previously explained why I agree with the UST that Howard Law misrepresented to Roberts that Loy would represent her. But I don't read the April 29 letter as informing her of any particular services that Loy or anyone else would perform. That letter is a misrepresentation, but it isn't a basis for finding failure to perform.

Morgan Drexen informed Roberts that it was in the process of finding replacement counsel for her. Eventually, it referred her to Brann. The UST argues that Howard Law did not act "timely" in this respect. It's true that five months passed before Brann took the case. But Howard Law communicated with Roberts during this time, and in June 2015 (four months after it took on representation of her), she agreed to allow "a couple more months" for it to get her an attorney. Although it may not have been appropriate for Howard Law to continue to purport to represent her for five months when it had no attorney available to represent her, that concern does not constitute a failure to provide promised services.

Howard Law did not fail to perform any service that it informed Roberts that it would perform.

### G.  *Third category of claims: section 526(a)(2), advising an assisted person to make false or misleading statements*

To be liable for violating section 526(a)(2), a defendant must be a debt-relief agency that either made, or counseled or advised an assisted person to make, an untrue or misleading statement in a document filed in a bankruptcy case or proceeding.

In the fifth claim for relief in the Roberts action, the UST alleges that Howard Law violated section 526(a)(2) by counseling or advising Roberts to make a statement or statements on bankruptcy documents that were untrue or misleading, or that upon the exercise of reasonable

care, should have been known to be untrue or misleading.[167] The UST did not make similar claims in the Stites or Arthur actions.

The UST lists five errors or omissions that it alleges made Roberts's bankruptcy documents untrue or misleading and that Howard Law counseled or advised her to make: (1) stating in response to SoFA item 9 that Roberts paid Brann in 2015 "$1,295.00 for bankruptcy representation" and "$355.00 for bankruptcy court filing fee," (2) stating in response to SoFA item 9 that Roberts paid Start Fresh Today $39 in July 2015 for credit counseling and debtor-education courses, (3) failing to disclose payments to Howard Law within one year of the petition date in the amount of at least $865 in response to SoFA item 9, (4) failing to disclose payments to Graeff Law within one year of the petition date of at least $1,118 in response to SoFA item 9, and (5) failing to list on Schedule B the difference between the amount of fees Roberts paid to Howard Law and the amount that Howard Law paid to Brann.[168]

As to the first four of the five errors or omissions, I agree with the UST. The first item was untrue because the amounts listed were paid by Roberts not to Brann but to Howard Law, which in turn paid them to Brann; the SoFA should have disclosed payments that Roberts made to Howard Law of at least $865 and to The Law Offices of Erik Graeff of at least $1,118. The second item, the allegation that Roberts didn't make the $39 Fresh Start payment, wasn't true; from the stipulated fact that Howard Law billed Brann for that amount,[169] I infer that it did so because it, not Roberts, had paid that amount. The third and fourth items were omissions of information required by the SoFA, and the implied representation that no payments had been made by Roberts to Howard Law or The Law Offices of Erik Graeff within one year before the petition date was untrue. The fifth item was a required disclosure on the personal-property

---

[167] Pretrial order, Ex. 2 at 11, ¶ 1.
[168] Id.
[169] Pretrial order, Ex. 1 at 33-34, ¶ 202.

Schedule B if in fact Howard Law owed Roberts a refund of the amount by which her payments to Howard Law exceeded the payment by Howard Law to Brann; the record is not clear that Howard owed Roberts a refund.

Howard Law raises four arguments in defense. First, it argues that Brann, who wasn't of-counsel for Howard Law, was the filing lawyer and thus was responsible for the contents of the bankruptcy documents.[170] I disagree. SoFA item 9 required Roberts to disclose all payments that she made to anyone for consultation about bankruptcy, among other topics, during the year before the petition date. The payments that she was required to disclose were not just those made to Brann, as the lawyer who happened to file the petition. Even if Howard Law had never had an attorney-client relationship with Roberts, it prepared the documents, including the SoFA, with the errors and omissions before Brann became involved. It thus is responsible for including the errors and omissions in the SoFA, even if Brann is also responsible.

As its second defense, Howard Law argues that the UST is precluded from litigating this claim because the UST is bound by an existing order, entered by stipulation between the UST and Brann, holding her responsible for the errors and omissions.[171] The UST's stipulation that Brann was responsible for the misstatements does not preclude the UST from now arguing that Howard Law was also responsible. It is possible that both Howard Law and Brann advised Roberts to make the same misstatements, and this possibility is consistent with the UST's theory of liability—that Howard Law's paralegal put the false statements into the documents and Brann subsequently ratified the false statements. Whether Howard Law, in addition to Brann, is responsible for the misstatements hasn't previously been litigated or decided.

---

[170] Howard Posttrial Br. at 55-56.
[171] Howard Posttrial Br. at 56.

As its third defense, Howard Law argues that there is insufficient evidence that it is responsible for drafting the SoFA with the errors and omissions.[172] Based on the log notes of the email exchanges between Rodriguez and Brann, I infer and find that the omissions and misstatements were in the draft documents that Howard Law, through its paralegals, had prepared before Brann's involvement and remained there when Howard Law finalized and sent them to Roberts to be signed.

That the SoFA errors and omissions were made by employees of Howard Law in the course of their duties for it means that Howard Law itself has violated section 526(a)(2). Regardless of whether Howard could be liable in tort or subjected to lawyer discipline for acts of Howard Law's employees, the section 526(c)(5) inquiry as to him is whether he, personally, acted intentionally to cause or ratify the acts of his employees that constitute the violation. There is no evidence of his personal involvement, either by supervision or ratification, in the preparation of the SoFA with its errors and omissions. And the UST hasn't pointed me to evidence on which I could ignore the distinction between Howard Law as a corporation and Howard as an individual under any nonbankruptcy legal theory, such as piercing the corporate veil.

As its fourth defense, Howard Law argues that the errors and omissions were corrected by Brann seven months before the UST filed its complaint in the Roberts action.[173] Howard Law refers to an amended compensation disclosure that Brann filed on November 29, 2015. That document corrected, at most, the incorrect disclosures by Brann (not Roberts) regarding payments to Brann during the prepetition year. The SoFA itself, and Schedule B, were not amended until March 18, 2016.[174] In any case, Howard Law's advice to Roberts to make untrue

---

[172] Howard Posttrial Br. at 57.
[173] Howard Posttrial Br. at 57.
[174] Roberts main case No. 15-63116-tmr7, docket item 24.

or misleading statements in her SoFA occurred at the latest when Howard Law sent the documents to Roberts to sign for filing, and it offers no evidence that it ever offered Roberts corrected advice regarding completion of her SoFA and schedules.

I disagree with each of Howard Law's four defenses as to itself, but I agree with its third defense as to Howard personally. I find that Howard Law, but not Howard, violated section 526(a)(2) in its preparation of the Roberts SoFA.

### H.    Fourth category of claims: section 329(a), failure to disclose compensation

Under section 329(a), an attorney representing a debtor in or in connection with a bankruptcy case must file a statement of compensation paid or agreed to be paid within the year before the petition was filed for services rendered or to be rendered in contemplation of or in connection with the case and the source of the compensation. Under Federal Rule of Bankruptcy Procedure 2016(b), an attorney for a debtor must file within 14 days after the order for relief the statement required by section 329, including whether the attorney has shared or agreed to share the compensation with any other entity and other information required by that rule.

In the ninth claim for relief in the Roberts action, the UST alleges that Howard Law failed to file a statement of compensation paid or agreed to be paid to Howard Law during the petition year for services rendered or to be rendered in contemplation of or in connection with the case.[175] The UST did not make similar claims in the Stites or Arthur actions.

As a law firm, Howard Law is an attorney under the Bankruptcy Code.[176]

Howard Law purported to represent Roberts. The representation was in connection with her bankruptcy case; its paralegals prepared her petition and other documents to be filed in the case. For the same reason, the services were in contemplation of or in connection with the case.

---

[175] Pretrial order, Ex. 2 at 12.
[176] Section 101(4) ("attorney" includes law firms).

Howard Law received fees in connection with Roberts's case in two ways. First, it directly debited $865 from her bank account during the period in which it was handling her representation. Second, it received all the money that Graeff had previously debited from her account. Howard Law argues that it did not receive compensation from her, because it paid Brann more than the $865 that it had received directly from Roberts.[177] The statute does not refer to compensation that the attorney retains, but to compensation that the attorney receives. That Howard Law later paid the money over to Brann does not mean that it never received it. Also, Howard does not satisfactorily address the $1,118 that it received from Graeff. I find and conclude that Howard did receive compensation of at least the sum of those two amounts, $1,983, in connection with her case, and it violated section 329(a) and Rule 2016(b) by not disclosing that compensation.

### I.       *Fifth category of claims: section 329(b), excessive compensation*

Under section 329(b), the court can compel an attorney for a debtor to disgorge compensation received from a debtor if the attorney represented the debtor in or in connection with a bankruptcy case, the representation included services in contemplation or in connection with the case, and within one year before the petition date the attorney received compensation that exceeded the reasonable value of the services.

In the eleventh claim for relief in the Roberts action, the UST claimed that Howard Law's fees paid by Roberts within the year before the petition date were unreasonable.[178] The UST did not include similar claims in the Stites or Arthur actions.

For most of the services that Howard Law's paralegals provided, it is impossible to determine on this record what the value of the services might have been. But at least one

---

[177] Howard Posttrial Br. at 58.
[178] Pretrial order, Ex. 2 at 13.

category of fees—for the LAP—was clearly excessive. Howard Law received, either directly from Roberts or from Graeff, $600 in LAP fees during the year preceding her bankruptcy filing. Whether coincidentally or not, $600 is very close to the difference between what it received and what it paid to Brann. Because the LAP provided no meaningful benefit to Roberts, those services had no value, and the $600 that she paid exceeded the value of the services by that amount.

### J.      Remedies

#### 1.      Remedies for violation of section 526

I have found two section 526 violations by Howard Law with respect to Roberts. In each of the fifth and seventh claims for relief in the Roberts action, the UST requests civil penalties of up to $5,000 and an injunction against future statutory violations.

If a violation was either intentional or part of a clear and consistent pattern and practice of violations, section 526(c)(5) permits imposition of civil penalties and an injunction.

##### (a)      *No remedy may be imposed for 526(a)(3) violation: April 29, 2015, letter*

I have identified one section 526(a)(3) violation: the misrepresentation in the April 29, 2015, letter that Loy was Roberts's bankruptcy attorney.

The April 29 letter containing the misrepresentation was generated automatically by Morgan Drexen's software. The software (for obvious reasons) required a local counsel to be assigned to each client file. When a new local counsel was substituted for a given client, the system automatically generated a letter memorializing the substitution. When both Graeff and Rennie had left the network, the only local counsel licensed in Oregon was Loy, so the software assigned him and automatically generated a letter. Howard Law's failure to recognize that the substitution was about to happen and prevent it from happening may have been negligent, or even grossly negligent, but it wasn't intentional.

Based on the evidence of Howard Law's and Morgan Drexen's operating procedures, it is certainly plausible that Morgan Drexen sent misinformation-containing letters to other clients. But there is no evidence in the record of any such letters having been sent. I can't conclude that this was part of a clear and consistent pattern and practice.

Because the violation was neither intentional nor part of a clear pattern and practice, neither a civil penalty nor an injunction is available.

> **(b)** ***Howard Law should be penalized monetarily for violation of section 526(a)(2), its preparation of Roberts's SoFA, and enjoined from future violations.***

I have identified one section 526(a)(2) violation: Howard Law's preparation of Roberts's SoFA without including required disclosures, constituting advice or counsel to Roberts to make the SoFA untrue or misleading.

Howard Law offered no evidence that its paralegals' preparation of the SoFA with the errors and omissions was anomalous. And it had an incentive to omit reference at least to the payments that Roberts made to it in order to avoid scrutiny of its business practices. I thus find that Howard Law acted intentionally in preparing the SoFA with its errors and omissions. But I have no evidence of other similar violations and thus I don't find that it is part of a clear pattern and practice of violations.

Having found that Howard Law acted intentionally in violating section 526(a)(2), I may award civil penalties of up to the $5,000 amount requested by the UST, and I may enjoin future violations.

The information required to be disclosed in SoFA item 9 furthers important bankruptcy policies. Identifying those whom the debtor paid for advice about or assistance in preparation for bankruptcy may provide sources of additional information about estate assets, and disclosure of the amounts paid enables evaluation of whether the payments are avoidable, either as excessive

under section 329(b) or otherwise. In view of the importance of the information that Howard Law intentionally omitted from the SoFA and the need to both penalize it and deter similar violations by others, Howard Law, but not Howard, should pay a penalty of $5,000.

Howard Law argues that the court lacks jurisdiction over the UST's request for an injunction because it and Howard stopped practicing bankruptcy law in 2015. A defendant asserting mootness because of its voluntary cessation of allegedly wrongful activity bears a "heavy burden" to show that it is "absolutely clear" that the activity won't recur.[179] But when the activity ceased before the litigation began, the Supreme Court has suggested that the burden is instead upon the plaintiff to demonstrate its standing despite cessation.[180] I have found no reported decisions holding that a defendant's prelitigation cessation of statutory violations deprives a regulatory agency, charged with enforcing the statute, of standing to seek an injunction against future violations. But because of the gravity of this jurisdictional concern, I address Howard Law's argument.

Although Howard Law no longer practices bankruptcy law (and Howard has expressed no intention to do so in the future),[181] two factors convince me that there is a sufficiently great threat that, in the absence of an injunction, Howard Law will resume violating section 526(a)(2). First, it isn't necessary that a person be a bankruptcy lawyer to violate section 526(a)(2). Nonbankruptcy lawyers often represent consumer clients who go on to file bankruptcy, and I have concluded in part IV.E.1(b) above that there may be a sufficient connection between that

---

[179] *Friends of the Earth, Inc. v. Laidlaw Environmental Svcs. (TOC), Inc.*, 528 U.S. 167, 189, 191 (2000).
[180] *See Knox v. Svc. Employees Intern. Union, Local 1000*, 567 U.S. 298, 308 (2012) ("[S]ince the union continues to defend the legality of the Political Fight-Back fee, it isn't clear why the union would necessarily refrain from collecting similar fees in the future"); *U.S. v. Laerdal Mfg. Corp.*, 73 F.3d 852, 856 (9th Cir. 1995) (defendant's "intransigent insistence on its own blamelessness" and "repeated self-justification" demonstrated likelihood of future violation).
[181] Trial test. April 4, 2017, at 3:18 p.m.

representation and the future bankruptcy case to support section 526(a)(2) liability. Howard Law's practice has been consumer-oriented for many years, and there is a strong likelihood that Howard will continue to represent insolvent or nearly insolvent consumers in the future.

Second, the vehemence with which Howard has denied that Howard Law's behavior was unlawful supports the conclusion that it will resume that behavior unless enjoined.[182] I don't fault it for defending itself, but Howard's insistence that Howard Law has done nothing wrong undercuts the credibility of his contention that it will never "return to [its] old ways" if not enjoined from doing so.

Howard Law should be enjoined from further violations of section 526(a)(2).

### 2. Fee disgorgement under section 329

#### (a) Howard Law should disgorge its fees received during the prepetition year for failing to disclose them under section 329(a).

In the UST's ninth claim for relief in the Roberts action, the UST requests that the court order Howard Law to refund all fees received from Roberts due to Howard Law's violations of section 329(a) and Rule 2016(b) pursuant to section 105(a) and the Ninth Circuit's 1995 decision in *In re Park-Helena Corp.*[183]

I have found above that Howard Law violated section 329(a) and Rule 2016(b) by failing to disclose in Roberts's case the compensation that she paid during it during the year before the petition date. Howard Law should be required to disgorge to Roberts's estate $1,983, the amount that it should have disclosed as received from Roberts during that year.

---

[182] *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953) ("The defendant is free to return to his old ways").
[183] 63 F.3d 877 (9th Cir. 1995).

> **(b)** ***Howard Law should be required to disgorge $600 of the fees it received during the prepetition year as excessive under section 329(b).***

In the UST's eleventh claim for relief in the Roberts action, it alleges that Howard Law's fees paid by Roberts within one year of the petition date should be determined to be unreasonable under section 329(b) because the fees she paid exceeded the reasonable value of the services provided.[184]

Howard Law should be required to disgorge to Roberts's estate $600, the amount she paid for the LAP, for which she received no value. Because the LAP payment is a portion of the amount that should be disgorged as not having been disclosed under section 329(a) and Rule 2016(b), the court's judgment won't require the $600 disgorgement in addition to the section 329(a) disgorgement amount.

## V.    Conclusion

These actions were pleaded and tried as claims by the UST under sections 526(a)(3), (a)1), and (a)(2) and 329(a) and (b). I have found that both Howard Law and Howard violated section 526(a)(3) by making a misrepresentation to Roberts, but not to Stites or Arthur; neither Howard Law nor Howard violated section 526(a)(1) by failing to perform services that they said that they would perform; and Howard Law, but not Howard, violated section 526(a)(2) by advising or counseling Roberts to make untrue or misleading statements in her SoFA.

Considering remedies that are available in actions brought by the UST as plaintiff, I have determined that the violation of section 526(a)(3) was neither intentional nor part of a clear pattern and practice of violations, so under section 526(c)(5), no remedy is available for that

---

[184] Pretrial order, Ex. 2 at 13.

Page 46 – MEMORANDUM DECISION (NOT FOR PUBLICATION)

violation, and the violation of section 526(a)(2) by Howard Law warrants a penalty of $5,000 Law and an injunction against future violations.

* * *